CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

7/30/2025

LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| LYNCHBURG REPUBLICAN CITY COMMITTEE and VERONICA BRATTON, | CASE NO. 6:25-cv-00029 |
| *Plaintiffs,* | OPINION |
| v. | JUDGE NORMAN K. MOON |
| VIRGINIA DEPARTMENT OF ELECTIONS, STATE BOARD OF ELECTIONS, and SUSAN BEALS, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE DEPARTMENT OF ELECTIONS, | |
| *Defendants.* | |

The Lynchburg Republican City Committee and its chairperson, Veronica Bratton, bring this 42 U.S.C. § 1983 civil rights action against the Virginia Department of Elections, its Commissioner Susan Beals, and the State Board of Elections, all of whom are responsible for regulating and administering elections in the Commonwealth of Virginia.[1] The Committee[2] challenges as unconstitutional the state's recently implemented elections statute, Virginia Code § 24.2-509(A), which requires political parties to facilitate absentee voter participation in closed,

---

[1]    The State Board of Elections "consist[s] of five members appointed by the Governor." Va. Code § 24.2-102(A). It "is charged with carrying out Virginia's election laws." *Miller v. Brown*, 462 F.3d 312, 321 (4th Cir. 2006) (citing Va. Code. § 24.2–103) (detailing the Board's duties). It does so primarily "*through* the Department of Elections." *See* Va. Code. § 24.2–103 (emphasis added). The Department of Elections is led by its "principal administrative officer," the Commissioner of Elections. Va. Code § 24.2-102(B). The Commissioner is appointed by the Governor to a four-year term, subject to confirmation by the General Assembly. *Id.*

[2]    In this opinion, we refer to Plaintiffs Lynchburg Republican City Committee and chairperson Bratton collectively as "the Committee." We refer to Defendants Commissioner Beals, the State Board of Elections, and the Department of Elections collectively as "Commissioner Beals" or simply "Beals."

intra-party nominations. The Committee seeks declaratory and injunctive relief to invalidate the law and enjoin further enforcement by the Department. *See* Dkt. 1 at 26 (Complaint).[3] It also seeks a writ of mandamus requiring Commissioner Beals to accept its nomination without adhering to the challenged statute. *Id*. at 27.

Commissioner Beals moves to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. 8 (motion); Dkt. 9 (memorandum).

As explained below, the Court will **GRANT** Commissioner Beals' motion to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1).

## I.    Legal Standard

A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure tests a district court's subject matter jurisdiction. The burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss is on the plaintiff, as the party invoking the court's jurisdiction. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). When a defendant argues that "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based[,]" all the facts alleged in the complaint are assumed to be true and the plaintiff "is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id*. However, when a defendant alleges that the jurisdictional allegations in a complaint are not true, a trial court may go beyond the allegations of the complaint and hold an evidentiary hearing to determine if there are facts to support the jurisdictional allegations. *Id*; *see also Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) ("If the defendant challenges the

---

[3]    For record citations throughout this opinion, the Court adopts the ECF page number superimposed on the parties' filings.

factual predicate of subject matter jurisdiction, 'a trial court may then go beyond the allegations of a complaint *and in an evidentiary hearing* determine if there are facts to support the jurisdictional allegations,' without converting the motion to a summary judgment proceeding.") (quoting *Adams*, 697 F.2d at 1219) (emphasis original).

## II.    Background

"Elections in Virginia do not begin in the November general election." Dkt. 1, ¶ 14. "They begin during the party nomination process, when the major political parties select the nominees that the voters will see on the ballot in November." *Id*. For local elections, the major political parties rely on a network of smaller political committees based in cities and counties to produce nominees. The local committees are authorized to select their choice of nomination method and must certify to the State Board of Elections whichever method is chosen. *See* Va. Code § 24.2-509(A) ("The duly constituted authorities of the political party for the district, county, city, or town . . . shall have the right to determine the method by which a party nomination for [a local office] shall be made."); *id*. § 24.2-516 ("Each chairman shall file timely written notice with the Board whether or not a primary has been adopted and identify each office for which a primary has been adopted.").

Historically, committees have been free to choose between either (1) a state-run, open primary, "which is paid for by the taxpayers and open to all registered voters" regardless of party affiliation,[4] or (2) a "party-run process such as a convention, mass meeting, or party canvass (sometimes called a 'firehouse primary')," which allows the party to restrict participation to

---

[4]    Virginia voter registration does not account for political party affiliation. Thus, state-run primaries being open to all registered voters means that primary contests cannot exclude voters based on party affiliation. *See* Va. Code § 24.2-530 ("All persons qualified to vote . . . may vote at [a] primary.").

party affiliates. Dkt. 1, ¶ 15.[5] The Committee alleges that Virginia Republicans have consistently "opposed open primaries" because the party apparatus cannot prevent non-Republicans from "raiding" the primary contests. *Id*. ¶ 17. This is especially true where the opposing party's primary is uncontested or lopsided, obviating the need for that party's constituents to participate and incentivizing them to vote in the Republican nomination. *Id*. ¶ 27. The only restriction on "raiding" in open primaries is that a person can only vote in one primary per election cycle. *See* Va. Code § 24.2-530 ("All persons qualified to vote . . . may vote at the primary. No person shall vote for the candidates of more than one party.").

In 2021, the Virginia General Assembly amended a portion of the state elections code to require parties to provide for absentee participation in their nomination processes. *See* H.B. 2020 (2021) (now codified at Va. Code § 24.2-509(A)). The statute provides that "[a] method of nomination shall not be selected if such method will have the practical effect of excluding" certain enumerated classes of absentee voters. Va. Code § 24.2-509(A). These classes of voters are "qualified voters who are otherwise eligible to participate in the nominating process under that political party's rules but are unable to attend" the nomination for one of five reasons: (1) active duty military service; (2) "temporarily residing outside of the United States"; (3) "attending a school or institution of higher education"; (4) having a disability; or (5) having a "communicable disease of public health threat." *Id*.

 The Committee alleges that in 2024 it "attempted to conduct a party canvass . . . to nominate [its] candidate for [Lynchburg] City Council, after making drastic changes to [its] rules

---

[5]     *See also 6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393, 398 (4th Cir. 2019) ("The differences between these methods are substantial. Each one creates a different distribution of potential voters . . . in the nomination process. For example, primaries involve the largest pool of potential voters, whereas conventions and mass meetings lend themselves more toward committed partisans. The choice of method, therefore, could have a significant influence on the choice of nominee.") (internal quotations and alterations omitted).

in an attempt to provide an efficient process for absentee voting." Dkt. 1, ¶ 47. (The complaint does not allege further facts regarding the outcome of this attempt.) Allegedly in response to the Committee's action, Virginia House of Delegates Minority Leader Todd Gilbert (R – Shenandoah County), "asked Virginia Attorney General Jason Miyares for an opinion as to whether even the [Committee's] absentee-friendly party canvass process would pass muster under the convention ban law." Dkt. 1, ¶ 48.[6]

The Attorney General issued an opinion in February 2024 concluding that "[a] political party may not select a nomination method that de facto requires covered voters to be physically present to participate or that otherwise has the practical effect of excluding their participation." Dkt. 1, ¶ 50. General Counsel for the Republican Party of Virginia, Chris Marston, then advised all 133 county and city committees, including Plaintiff Committee, that "a state-run primary is the only way the Party can nominate candidates for public office." Dkt. 1, ¶ 51. Marston further advised that "[a]ll chairs who have nominating contests this year should advise the Department [of Elections] that they will use a primary by the March 5 deadline." Dkt. 1, ¶ 52. In parallel, the chairman of the 31st House District Republican Committee, Timothy Johnson, attempted to certify a candidate nominated by party canvass. Dkt. 1, ¶ 53. Beals, as Commissioner of the Department of Elections, rejected the certification. The Committee's complaint construes Commissioner Beals' rejection as hinging upon the District selecting a "non-primary method of nomination." Dkt. 1, ¶ 54. But the facts show differently. Beals' full email states that the House District's "non-primary nomination method" was rejected because it "only permitted 9 calendar days (less than 7 full business days) for participation." Dkt. 9-4 (Beals' email to Johnson).[7] Beals

---

[6]    The complaint does not allege additional facts regarding the substance of then-Minority Leader Gilbert's request, but we note that the Attorney General's opinion does not mention the Committee's canvass process.

[7]    The Committee states that it attached Commissioner Beals' email to its complaint, *see* Dkt. 1, ¶ 54, but no attachment was present. In any case, Beals subsequently attached the email to her motion to dismiss as Exhibit C.

stated that "[t]his timeframe made it facially impossible for the covered voters of § 24.2-509(A) to participate in the complete nomination process as required by that statute." *Id*.

Based on these events, the Committee alleges that it has been told "at every level" that it "[has] no option but to adopt a state-run, open primary in which Democrats and other opponents to the Republican Party can raid the process of selecting their nominees." Dkt. 1, ¶ 55. It alleges that the Party Plan of the Republican Party of Virginia allows the Committee "to determine its own membership" and avoid "raiding" by requiring persons to pledge their fealty in nominating contests, but that these features of the party plan are "effectively nullified" and rendered impossible by Section 24.2-509(A). *Id*. ¶ 56. The Committee argues that such an encroachment on its party's operations violates its rights to free speech and association under the federal and state constitutions, and results in "financial and electoral injury." *Id*. ¶ 58.

Moreover, the Committee alleges that further injury is forthcoming "as the 2026 City Council races approach." Dkt. 1, ¶ 82. In the previous election cycle, Peter Alexander and Chris Faraldi, both Republicans, competed in the 2024 primary for the Ward IV Lynchburg City Council seat. *See id*. ¶¶ 82-92. Faraldi won. *Id*. Alexander had signed a statement of intent under the party's plan, promising to support the party's nominees in the general election. *Id*. But after his defeat, he began a write-in campaign as an independent. *Id*. He again lost in the general election, with Faraldi prevailing over him and Democrat April Watson. *Id*. Alexander then announced his intention to run against Republican City Council member Stephanie Reed in the

---

*See* Dkt. 9-3. At the Rule 12(b)(1) motion to dismiss stage, courts "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). Furthermore, courts "may consider authentic, extrinsic evidence that is integral to the complaint, as well as matters of public record." *Episcopal Church in S.C. v. Church Ins. Co. of Vermont*, 997 F.3d 149, 155 (4th Cir. 2021) (citing *Evans* in footnote). Here, because Commissioner Beals's email is integral to and explicitly relied on in the complaint, the Court can consider it in evaluating the motion to dismiss. *See* Dkt. 1, ¶ 54.

2026 Republican Primary. *Id.*

The Committee alleges that the party plan would normally disqualify Alexander from participating in future party actions due to his opposition to Faraldi in the previous general election. Dkt. 1, ¶ 92. However, it claims that Section 24.2-509(A) renders the plan's gatekeeping function impossible. It alleges that "[i]f state law had not prohibited the Plaintiff Committee from holding a mass meeting, convention, or party canvass, the Committee could keep Alexander from participating and seeking the party's nomination, as the Party Plan declares that he may not participate." Dkt. 1, ¶ 95.

## III.    Discussion

The statute at issue here, Virginia Code § 24.2-509(A), provides as follows:

> The duly constituted authorities of the political party for the district, county, city, or town in which any other office is to be filled shall have the right to determine the method by which a party nomination for that office shall be made. **A method of nomination shall not be selected if such method will have the practical effect of excluding participation** in the nominating process by qualified voters who are otherwise eligible to participate in the nominating process under that political party's rules but are unable to attend meetings because they are (i) a member of a uniformed service, as defined in § 24.2-452, on active duty; (ii) temporarily residing outside of the United States; (iii) a student attending a school or institution of higher education; (iv) a person with a disability; or (v) a person who has a communicable disease of public health threat as defined in § 32.1-48.06 or who may have come in contact with a person with such disease.

Va Code. § 24.2-509(A) (emphasis added). The Committee alleges that the statute is unconstitutional on three grounds: (1) freedom of speech under the First Amendment; (2) freedom of association under the First Amendment; and (3) freedom of speech and association under the Virginia Constitution. Dkt. 1 at 20-26; *see* VA. CONST. art. 1, § 12 ("[T]he General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of

the people peaceably to assemble, and to petition the government for the redress of grievances.").[8]

In its presentation of its claims, the Committee does not explain whether each cause of action is brought as a facial challenge, an as-applied challenge, or both. On one hand, the Committee asks the Court to invalidate and enjoin Section 24.3-509(A) based on its violation of *the Committee's* First Amendment rights and the Committee's particular intent to "select and certify" a non-primary method of nomination. Dkt. 1 at 26-27. On the other hand, the Committee also asks the Court to declare that the law is "without force" and "may not be constitutionally applied anywhere in Virginia to any political party." *Id*. at 27. Accordingly, we construe the complaint as bringing both facial and as-applied challenges.

"[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding breadth of the remedy." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). To succeed in a facial constitutional challenge, a movant "must establish that no set of circumstances exists under which the [challenged statute] would be valid." *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016). By contrast, "[a]n as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case." *United States v. Mgmt. Consulting, Inc*., 636 F. Supp. 3d 610, 619 (E.D. Va. 2022). An as-applied challenge must be "based on a developed factual record and the application of a statute to a specific person." *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc). However, whether the challenge is facial or as-applied "does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Bucklew*, 587 U.S. at

---

[8]    The Committee's federal and state constitutional claims are co-extensive. *See* Elliot v. Commonwealth, 267 Va. 464, 472–74 (2004) ("Article I, § 12 of the Constitution of Virginia is coextensive with the free speech provisions of the federal First Amendment."); Dkt. 1, ¶ 134 (citing *Elliot* for the same proposition).

138.

The Court concludes that the Committee's action must be dismissed whichever way it is framed. Insofar as the Committee argues that Section 24.2-509(A) is unconstitutional **as applied**, this claim must be dismissed for lack of ripeness under Rule 12(b)(1). Section 24.2-509(A) is plainly reasonable and non-discriminatory, and by its text it imposes only modest burdens on the Committees' First Amendment rights. Where a state election law imposes only modest burdens, the Court must weigh the state's justification for the law versus the plaintiff's burden. *See Fusaro v. Cogan*, 930 F.3d 241, 257 (4th Cir. 2019) (stating that First Amendment challenges to non-discriminatory and reasonable state election laws are usually subject to ad hoc balancing). But here, the Committee's burden remains entirely speculative. The Committee has not attempted to comply with the law and the law has yet to be enforced against it. Thus, the Committee's as-applied challenge is not fit for judicial resolution. It must be dismissed for lack of ripeness under Rule 12(b)(1).

Insofar as the Committee argues that Section 24.2-509(A) is **facially unconstitutional**, the Court finds that this claim is likewise unripe. Facial challenges require the plaintiff to show that application of the law is unconstitutional no matter the circumstances, but if the Committee has not shown that Section 24.2-509(A) is unconstitutional as applied to its own circumstances, it certainly has not shown that the law is facially invalid in all or most circumstances. (In other words, a facial challenge generally cannot succeed if the plaintiff cannot show the law is unconstitutional as applied in its own case.) Principles of judicial restraint also advise against entertaining such facial challenges. *See* Section B, *infra* (discussing overlap of ripeness doctrine and high bar for facial challenges). Thus, the Committee's facial challenge must also be dismissed pursuant to Rule 12(b)(1).

### A. The As-Applied Constitutionality of Section 24.2-509(A) is Not Ripe for Judicial Resolution

Ripeness, as with standing, "originates in the 'case or controversy' constraint of Article III." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013). It is therefore "a question of subject matter jurisdiction." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013). The burden of proving ripeness falls on the plaintiff. *Renne v. Geary*, 501 U.S. 312, 316 (1991).

To determine whether a case is ripe, courts "balance 'the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.'" *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quoting *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002)). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). Stated differently, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Scoggins*, 718 F.3d at 470 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

"The hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiffs who would be compelled to act under threat of enforcement of the challenged law." *Miller*, 462 F.3d at 319.

Ripeness has particular application in the context of challenges to administrative actions:

> [I]njunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision

10

> has been formalized and its effects felt in a concrete way by the
> challenging parties.

*See Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by*

*Califano v. Sanders*, 430 U.S. 99 (1977).

Here, the Court finds that, on balance, the Committee's case is not ripe for review. The

Committee argues that withholding judicial review constitutes a hardship upon its operations,

given the compressed nature of election timelines. But the Committee's claims are simply unfit

for judicial resolution at this stage. As explained herein, the Committee brings a First

Amendment challenge to a state elections statute which does not trigger strict scrutiny, and the

legal test which controls such claims would require the Court to balance the state's justification

for the law with the burden imposed upon the Committee. *See Fusaro v. Cogan*, 930 F.3d 241,

257 (4th Cir. 2019) (stating that "election laws are usually, but not always, subject to ad hoc

balancing") (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995)).

However, the burden on the Committee is only speculative at this point. Where the statute is

reasonable on its face, lacks any implementing guidance, and has not been enforced against the

Committee, the Court's intervention at this stage would be little more than an advisory opinion

that violates the case and controversy requirement of Article III.

### 1. Fitness for Judicial Decision

The question for judicial resolution here, in its plainest terms, is whether it is

unconstitutional for Virginia to require political parties to provide for absentee voter

participation in non-primary nomination contests.

"State election regulations often 'implicate substantial voting, associational and

expressive rights protected by the First and Fourteenth Amendments.'" *Libertarian Party of*

*Virginia v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016) ("*Libertarian Party*") (quoting *Pisano v.*

*Strach*, 743 F.3d 927, 932 (4th Cir. 2014)). On one hand, "[a] political party has a First Amendment right to limit its membership as it wishes, and to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform." *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 202 (2008). Indeed, "the processes by which political parties select their nominees are [not] . . . wholly public affairs that States may regulate freely." *California Democratic Party v. Jones*, 530 U.S. 567, 572-73 (2000). "[W]hen States regulate parties' internal processes they must act within limits imposed by the Constitution." *Id.*

On the other hand, "the Constitution does not grant political parties free reign in determining their nomination processes." *Fitzgerald v. Alcorn*, 285 F. Supp. 3d 922, 947 (W.D. Va. 2018) ("*Fitzgerald*"), *aff'd sub nom. 6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393 (4th Cir. 2019) (citing *Lopez Torres*, 552 U.S. at 203). "States have a major role to play in structuring and monitoring the election process, including nominee selection." *6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393, 402 (4th Cir. 2019) ("*Alcorn*"). The Supreme Court has "considered it 'too plain for argument,' for example, that a State may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion." *Jones*, 530 U.S. at 572 (quoting *American Party of Tex. v. White*, 415 U.S. 767, 781 (1974)).

To address First Amendment challenges to a state election laws, the Supreme Court has articulated a "flexible standard," known as the *Anderson-Burdick* test. *Fusaro*, 930 F.3d at 257 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). Under that test, "a court must first determine whether protected rights are severely burdened," because if so, strict scrutiny applies. *Id*. at 257-58. (quotation marks omitted). "However, the class of laws facing this higher scrutiny

is limited." *Libertarian Party*, 826 F.3d at 717. Subjecting too many laws to strict scrutiny "would unnecessarily 'tie the hands of States seeking to assure that elections are operated equitably and efficiently.'" *Id.* (quoting *Burdick*, 504 U.S. at 433).

If the challenged election law "imposes only 'reasonable, non-discriminatory restrictions,'" the burden is not severe, and strict scrutiny does not apply. *Burdick*, 504 U.S. at 434. In that case, "the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that 'order, rather than chaos, is to accompany the democratic processes.'" *Fusaro*, 930 F.3d at 258; *see also Alcorn*, 913 F.3d at 402 ("Not every burden on associational rights is unconstitutional . . . . Where the burden imposed by the state is not severe—where it is lesser—courts engage in less exacting review.") (internal quotations and citations omitted).

To determine the threshold question of whether the burden is severe, courts may look "to the text of a challenged statute, its practical operation, and whether it is 'facially neutral and nondiscriminatory,' which—in this context—has generally referred to a statute that does not favor one political party or viewpoint over another." *Fusaro*, 930 F.3d at 259. Indeed, "the controlling precedents emphasiz[e] that when a court evaluates an electoral regulation, political neutrality is a touchstone for assessing the burden imposed thereby." *Fusaro*. 930 F.3d at 263; *see, e.g.*, *Libertarian Party*, 826 F.3d at 717 ("The law is facially neutral and nondiscriminatory—neither . . . party faces a disproportionate burden. All parties are subject to the same requirements. None are automatically elevated to the top of the ballot."). This is in part because a non-neutral statute—"an election regulation that plausibly burdens First Amendment rights on the basis of viewpoint, political affiliation, or class"—would be automatically subject to strict scrutiny. *Id.* at 261. While burden is context-dependent, courts often reach this question

on a motion to dismiss "because its resolution generally depends on legal—rather than factual—sources and considerations." *Fusaro*, 930 F.3d at 259.

      Several cases delineate the line between severe and modest burdens. In *California Democratic Party v. Jones*, the Supreme Court applied strict scrutiny and struck down California's blanket primary law, Proposition 198, because it required political parties to "adulterate their candidate-selection process . . . by opening it up to persons wholly unaffiliated with the party," who may have held different views from the party. *Jones*, 530 U.S. at 581. In *Eu v. San Francisco County Democratic Central Committee*, the Court applied strict scrutiny and struck down California's ban on primary endorsements, because it prevented parties from "stating whether a candidate adheres to the tenets of the party" and thereby "directly hamper[ed] the ability of a party to spread its message." 489 U.S. 214, 223 (1989). However, in *Clingman v. Beaver*, the Court found that Oklahoma's semiclosed primary law did not impose severe burdens when it provided that only registered party members and registered Independents could vote in a political party's primary. 544 U.S. 581, 590 (2005). The Court reasoned that "Oklahoma's law [did] not regulate the [party's] internal processes, its authority to exclude unwanted members, or its capacity to communicate with the public." *Id*. Similarly, in *Timmons v. Twin Cities Area New Party*, the Court found that a Minnesota law did not impose severe burdens when it prohibited individuals from appearing on the ballot as the candidate of more than one party. 520 U.S. 351, 363 (1997). The Court reasoned that the law did not "restrict the ability of the [party] and its members to endorse, support, or vote for anyone they like," nor did the law "directly limit the party's access to the ballot." *Id*; *see also Clingman*, 544 U.S. at 590 (discussing *Timmons* and stating that "Minnesota had neither regulated the New Party's internal decisionmaking process, nor compelled it to associate with voters of any political persuasion").

14

*a. Strict Scrutiny Does Not Apply*

Here, Section 24.2-509(A) imposes only modest burdens on political parties and operates more like the statutes in *Timmons* and *Clingman*. First, the text of the statute is extremely limited in its effect. It merely requires that nomination methods not have the "practical effect" of excluding absentee participation by certain voters in party-led nomination contests. The exact meaning of the phrase "practical effect" remains to be expounded upon (either by the entities responsible for implementing the law,[9] or by the courts in response to a concrete, adjudicable set of facts that elucidates the phrase's application).[10] However, on its face, a logical corollary to the "practical effect" requirement is that parties need only provide *practical* levels of absentee participation for those voters. The statute's plain language does not require elaborate, unfailing mechanisms of participation which might pose severe burdens. To avoid the "practical effect" of exclusion, in other words, parties need only ensure *practical levels of inclusion.*

Second, the practical exclusion provision is limited in its scope: It only applies to voters who are "qualified" and "eligible" to participate under the party's rules, and only when those voters are "unable to attend" the nomination because they belong to one of five classes of voters. *See* Va. Code § 24.2-509(A) (listing classes of people such as the disabled, military service members, and students, among others).

Third, the statute is plainly neutral and non-discriminatory. "[P]olitical neutrality is a touchstone for assessing the burden imposed" by an election law. *Fusaro*, 930 F.3d at 263. And here, "[a]ll parties are subject to the same requirements" under Section 24.2-509(A). *Libertarian*

---

[9]    *See* Va. Code § 24.2-103(A) ("The State Board, through the Department of Elections, shall supervise and coordinate the work of the county and city electoral boards and of the registrars to obtain uniformity in their practices and proceedings and legality and purity in all elections. . . . **It shall make rules and regulations and issue instructions and provide information consistent with the election laws to the electoral boards and registrars to promote the proper administration of election laws**.") (emphasis added).

[10]    The Committee floated overbreadth and void for vagueness arguments at the hearing on Beals' motion to dismiss, but the Committee does not assert any such causes of action in its complaint.

*Party*, 826 F.3d at 717. No party is alleged to face a disproportionate burden by having to provide practical levels of absentee participation for military members, the disabled, students, and others.

Fourth, and most importantly, the statute does not burden political parties' right to select their nominee of choice or exclude non-affiliates. The law clearly preserves parties' rights to adopt rules which determine who is "eligible to participate in the nominating process," and, as noted, the absentee requirement only applies to those voters whom parties have deemed eligible. Thus, Section 24.2-509(A) does not require parties to open their doors or their voter rolls to non-members, and it does not compromise parties' ability to cultivate a political message or select the appropriate standard bearer of that message. This constitutes a significant departure from the statutes at issue in *Jones* and *Eu*, which were found to be severe burdens. Unlike *Jones*, Section 24.2-509(A) does not "adulterate [parties'] candidate-selection process . . . by opening it up to persons wholly unaffiliated with the party," who may have different views from the party. *Jones*, 530 U.S. at 581. And unlike *Eu*, the statute does not prevent parties from "stating whether a candidate adheres to the tenets of the party" or "directly hamper the ability of a party to spread its message." *Eu*, 489 U.S. at 223. Indeed, neither the text of Section 24.2-509(A) nor any concrete facts indicate that the statute intrudes at all upon "the process by which a political party 'selects a standard bearer who best represents the party's ideologies and preferences." *Jones*, 530 U.S. at 575 (quoting *Eu,* 489 U.S. at 224) (internal quotation marks omitted)). Without such indices of constitutional encroachment, the Committee's arguments fall short.

Together, these factors demonstrate that Section 24.2-509(A) does not impose severe burdens on the Committee's speech or associational rights. It requires only that the Committee make **practical** efforts to include voters who (1) are eligible and qualified to participate under

the party's rules, (2) belong to one of the enumerated classes, and (3) cannot attend the called-for nomination event. The statute is politically neutral and does not intrude upon the Committee's ability choose its message or its nominee. "To deem ordinary and widespread burdens like [this] severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Clingman*, 544 U.S. at 593. "The Constitution does not require that result." *Id*. Accordingly, Section 24.2-509(A) does not trigger strict scrutiny.

### b.   The Committee's Burden Is Speculative

In lieu of strict scrutiny, courts must "balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests." *Fusaro*, 930 F.3d at 258 (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995)); *Alcorn*, 913 F.3d at 402. Commissioner Beals asserts that the Commonwealth has a "fundamental interest in ensuring that active-duty military, people with disabilities, students, and others who are unable to attend in person are afforded an opportunity to participate in their own party's nominating process." Dkt. 9 at 26. The Committee, meanwhile, argues that the absentee requirement is such a demanding and costly requirement that it will, in effect, render its party-led nominations impossible and force it to hold state-run, open primaries—vulnerable to raiding by opposing parties. *See, e.g.,* Dkt. 1, ¶ 13 (complaint arguing that Section 24-2.509(A) bars "political parties from holding nomination methods such as conventions, mass meetings, and party canvasses, that can be limited to members of the party only" and instead requires them "to hold 'open primaries' required by state law to be open to 'raiding' by members of opposing political parties"). To show this on the merits, the Committee could certainly adduce evidence regarding their current practices and resources. Indeed, it contends in its complaint and filings

17

that it is a small, volunteer-run outfit with few resources. *See, e.g.*, Dkt. 11 at 8. But this is only half the picture. What the Committee cannot answer is what the statute actually requires.

The statute on its face provides simply that that "[a] method of nomination shall not be selected if such method will have the practical effect of excluding" certain enumerated classes of absentee voters. Va. Code § 24.2-509(A). This is not a bright line rule. Unhelpfully to the Committee, and perhaps others, the State Board of Elections has not issued any implementing guidance or regulations regarding this provision (despite having the requisite authority to do so).[11] Thus, what counts as "practical" remains to be seen. (The Committee floated a void for vagueness argument at the hearing on Commissioner Beals' motion to dismiss, but these claims do not appear in the complaint.) Meanwhile, the Committee has not attempted to propose a plan to Beals to seek compliance with the law. It apparently began to attempt compliance in 2024 but was dissuaded by its party leadership and opted to hold an open primary instead. *See* Dkt. 1, ¶ 51 (stating that Chris Marston, General Counsel for the Republican Party of Virginia, advised all 133 county and city committees, including the Committee, that "a state-run primary is the only way the Party can nominate candidates for public office"). Without application of the law either through the efforts of the Committee or the Department of Elections, the Committee presents few record facts that could support its claim—or judicial resolution of the claim—on the merits.

The Committee points to two sources of information which, it contends, solve this problem and show that Section 24.2-509(A) will be interpreted and enforced aggressively. First, it points to the Attorney General's opinion, which does in fact project a high standard for

---

[11]    *See* Va. Code § 24.2-103(A) ("The State Board, through the Department of Elections, shall . . . . **shall make rules and regulations and issue instructions and provide information consistent with the election laws to the electoral boards and registrars to promote the proper administration of election laws**.") (emphasis added). Indeed, Virginia's Administrative Code features an entire title section devoted to the administrative powers of the State Board. *See* Va. Admin. Code Title 1, Agency NO. 20. Among other provisions, the code states that "[a]ny person may petition the board to consider a regulatory action." 1 Va. Admin. Code 20-10-50. The code also contains full chapters on election administration and absentee voting participation. 1 Va. Admin. Code 20-20; *id*. 20-70.

compliance with Section 24.2-509(A). The Attorney General stated that:

> [A]n effort to allow participation remotely or through some form of absentee ballots necessarily would have to account for . . . those serving in combat zones or deployed on submarines. I note that with regard to state-run primaries, the Department of Defense (DOD) and the Virginia Department of Elections make extraordinary efforts to address these challenges . . . . A political party's failure to address these challenges in a like manner . . . could have the practical effect of excluding participation by military personnel, in violation of § 24.2-509(A).

*See* Dkt. 9-3 (Attorney General Opinion) at 4; *see also* 2024 Va. Op. Att'y Gen. No. 24-003, 2024 VA. AG LEXIS 2 (Feb. 16, 2024).[12] Respectfully, however, the Attorney General's opinion is just that—an opinion. It is neither a binding interpretation of the law nor a source of law itself. It is the Department of Elections, not the Attorney General, that will be implementing the law and evaluating parties' frontline efforts to comply with it. Accordingly, the Attorney General's opinion does not solve the Committee's problem. It does not persuade the Court that the record is developed enough to allow a merits resolution of the claims in this case.

Second, the Committee points to the experience of Virginia's 31st House District Republican Committee ("HD 31"),[13] which attempted to certify to the Department of Elections a party canvass and was rejected. Dkt. 1, ¶ 53. The Committee's framing of the attempt construes the rejection as hinging upon HD 31 selecting a "non-primary method of nomination," Dkt. 1, ¶ 54, but the facts show that HD 31's "non-primary nomination method" was rejected because it "only permitted 9 calendar days (less than 7 full business days) for participation." Dkt. 9-4 (Beals email to Johnson). Commissioner Beals stated that "[t]his timeframe made it facially

---

[12]   Given the standard set forth in footnote 7 of this opinion, the Court can consider the Attorney General's opinion in evaluating the motion to dismiss. The Attorney General's opinion is integral to and explicitly relied on in the complaint. *See* Dkt. 1, ¶ 50. It is also publicly available.

[13]   Virginia's House of Delegates District 31 includes portions of Warren, Frederick, and Clarke counties. The district does not include the City of Lynchburg or the counties contiguous to Lynchburg. *See* VIRGINIA PUBLIC ACCESS PROJECT, House of Delegates District 31 District Map (last accessed July 23, 2025), https://www.vpap.org/offices/house-of-delegates-31/district/.

impossible for the covered voters of § 24.2-509(A) to participate in the complete nomination process as required by that statute." *Id*.

For one, it is not clear how Commissioner Beals' rejection foretells that Section 24.2-509(A) will be enforced aggressively to the point that it is unconstitutional. The rejection notice leaves much clarity to be desired, but it says little more than parties ought to allow for more than 9 days of participation. It certainly does not provide compelling evidence of how Section 24.2-509(A) will be interpreted or implemented. More importantly, it does not bear on the Committee's experience. HD 31 is not a party to this suit, and the Committee cannot glom onto its experience for purposes of demonstrating ripeness before this tribunal.

Together, these factors suggest that the Committee's claims are not fit for judicial resolution at this stage.

Last, we think it is worthwhile to compare the instant case to others in which courts have entertained pre-enforcement challenges to state laws and found that the claims were ripe and justiciable. Our review of those cases suggests that the ripe claims at issue were largely facial challenges that required less factual development than the claims here. Two cases are particularly illustrative: *Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006), and *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979).

### (i)    Miller v. Brown

In *Miller v. Brown*, Virginia's 11th Senatorial District Republican Committee and its chairman challenged Virginia's open primary law on First Amendment grounds. 462 F.3d 312, 314-15 (4th Cir. 2006). The committee's incumbent candidate, Senator Stephen Martin, had selected a primary contest for his upcoming reelection bid, and this choice bound the committee

to hold a primary under the Incumbent Protection Act, Va. Code § 24.2–509(B). *Id.*[14] However, the committee sought to hold a primary which excluded Democrats from participating. It submitted a plan to the Board of Elections seeking certification of its exclusionary primary method. *Id.* The Board responded that it was obliged to follow and enforce Virginia's open primary law, Section 24.2–530, which provides that "All persons qualified to vote . . . may vote at the primary." *Id.* at 315-16.

The committee sued the Board in a declaratory judgment action under 42 U.S.C. § 1983 seeking a declaration that Virginia's open primary law violated its constitutional rights to free association. The district court dismissed for lack of standing and ripeness, the committee appealed, and the Fourth Circuit reversed.

The Fourth Circuit first noted that "[t]he allegation of having to associate with members of the other party during their candidate-selection processes unquestionably pleads a constitutional injury." *Miller,* 462 F.3d at 316. However, the real question was whether the committee's injury was actual or imminent, and whether the claims were ripe. On both fronts the Court concluded that the committee's claims were justiciable.

Regarding ripeness, the Court observed that "[t]he only issue in the case is whether Virginia's open primary law violates the plaintiffs' First Amendment rights to freely associate, which presents a purely legal question." *Id.* at 319. The law clearly required, on its face, association between political adversaries, and the committee's legal theory plainly called that unconstitutional. While the Board emphasized that the primary had yet to occur and thus the committee had yet to suffer its injury, the Court rejected this framing. "[T]he only true

---

[14]    We note that this application of the Incumbent Protection Act has since been held unconstitutional. *See 6th Cong. Dist. Republican Comm. v. Alcorn,* 913 F.3d 393, 398 (4th Cir. 2019) (provisions of Act that empowered incumbents to impose their choice of nomination method on political party, no matter what the party preferred under almost any circumstances, violated committee's First Amendment right of free association).

uncertainty is whether another candidate will file for office as contemplated by Section 24.2–526." *Id*. Because there was no uncertainty in the statute or its implementation, even as some facts remaining pending and no concrete enforcement action had occurred, the question was ripe for review. *Id*. at 321.

Here, the Committee presents an altogether different situation. The Committee challenges a law which, by its text, is reasonable and does not facially infringe upon their rights, unlike *Miller*. Furthermore, the Committee has not sought approval of any nomination method from the Department of Elections in compliance with the law, unlike *Miller*—where the plaintiffs had already proposed a plan and been rejected. The Committee only speculates that its future attempts will be rejected and its rights burdened. Whereas *Miller* left only a legal question to be resolved, the Committee's claims here hinge upon future factual uncertainties and administrative actions that render them unfit for this Court's intervention.

(ii)    *Babbit v. United Farm Workers National Union*

Next is *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979). There the Supreme Court assessed the ripeness of a First Amendment challenge to Arizona's farm labor statute, which generally governed the rights of agricultural union members. *Babbit*, 442 U.S. at 293. The plaintiffs, including the United Farm Workers National Union, challenged multiple, distinct provisions of the statute. *Id*. (For ease, we will refer to the plaintiffs as "the Union.") The Court found that some claims were ripe, while others were not.

As to the statute's provisions "regulating election procedures," the challenge was ripe. The Union's "principal complaint about the statutory election procedures is that they entail inescapable delays and so preclude conducting an election promptly enough to permit participation by many farmworkers engaged in the production of crops having short seasons."

*Babbitt*, 442 U.S. at 299. The statute contained "austere limitations on who is eligible to participate in elections," and the Union "adduced evidence tending to prove[] that the statutory election procedures frustrate rather than facilitate democratic selection of bargaining representatives." *Id*. at 299-300.

The defendants, who were all parties charged with implementing the law, urged the Court to "decline to entertain [the Union's] challenge until they undertake to invoke the Act's election procedures," so that the Court might "acquire information regarding how the challenged procedures actually operate, in lieu of the predictive evidence that [the Union] introduced at trial." *Babbitt*, 442 U.S. at 299. But the Court was not persuaded. Even though the Union and its members had not "invoked the Act's election procedures in the past nor . . . expressed any intention of doing so in the future," their reluctance did not defeat the justiciability of their challenge "in view of the nature of their claim." *Id*. The nature of the claim and the question for judicial resolution was "whether the election procedures are subject to scrutiny under the First Amendment at all." *Id*. at 301. Awaiting the Union's "participation in an election would not assist [the Court's] resolution of [that] threshold question," and thus there was "no warrant for postponing adjudication of the election claim." *Id*.

Here, the "nature" of the Committee's claim is a world apart from the nature of the above claim in *Babbit*. Whereas in *Babbit* the Union attacked the farm labor statute for its existing and detailed election provisions (such as the law's "austere limitations on who is eligible to participate in elections"), here the Committee challenges Section 24.2-509(A) based on its hypothetical view of what the law's one-sentence absentee provision will come to mean for its operations. The Court in *Babbit* saw no warrant for awaiting enforcement of the farm labor statute because the election provision's terms and effects were plain enough, while here the

23

Committee's legal challenge entails a single, capacious phrase—*viz.*, "practical effect of excluding"—whose terms and effects are far from obvious. In other words, this is not a case where the Court could determine the question on the merits—whether the absentee provision effectively precludes closed nomination methods—by merely looking to the statute. Thus, unlike the challenge to the election provisions in *Babbit*, we cannot say that future development of the record "would not assist our resolution." *Babbitt*, 442 U.S. at 301. There **is** "warrant for postponing adjudication of the [] claim." *Id*.

Notably, the Court in *Babbit* found that the Union's challenge to a separate provision of the farm labor statute, the "access provision," was not ripe. *Babbit*, 442 U.S. at 303-04. The access provision sharply limited the extent to which employers could be compelled to provide labor unions with certain accommodations (access to property, information, facilities, etc.) to organize or simply to communicate with farmworkers. *Id*. The Union argued that this access provision infringed upon its associational rights, but the Court found that its argument relied on conjecture:

> It may be accepted that the [Union] will inevitably seek access to employers' property in order to organize or simply to communicate with farmworkers. But it is conjectural to anticipate that access will be denied. More importantly, [the Union's] claim depends inextricably upon the attributes of the situs involved. They liken farm labor camps to the company town involved in *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), in which the First Amendment was held to operate. Yet it is impossible to know whether access will be denied to places fitting [the Union's] constitutional claim. We can only hypothesize that such an event will come to pass, and it is only on this basis that the constitutional claim could be adjudicated at this time. An opinion now would be patently advisory; the adjudication of [the Union's] challenge to the access provision must therefore await at least such time as [it] can assert an interest in seeking access to particular facilities as well as a palpable basis for believing that access will be refused.

*Babbitt*, 442 U.S. at 304.

In other words, adjudication of the constitutional challenge to the access provision depended on the resource sought and its situs (not to mention denial of access to that situs). These were factual uncertainties that rendered the legal calculus incomplete and speculative. Here, we are not dealing with an "access provision" or the First Amendment's collision with property or labor rights. But like *Babbit*, we are dealing with a legal inquiry—the state's justification for Section 24.2-509(A) balanced against the burden on the Committee—that depends on factual speculation. Like *Babbit*, "it is impossible to know" whether the Committee's attempt to hold a closed nomination "will be denied" by Commissioner Beals based on her implementation or enforcement of Section 24.2-509(A). And like *Babbit*, "it is impossible to know" whether the Committee's rights will have been infringed upon without this event coming to pass. Until the Committee attempts compliance with the law, "[w]e can only hypothesize," and "[a]n opinion now would be patently advisory."

***

We have concluded that the statute—especially based on its text and its "practical operation," *Fusaro*, 930 F.3d at 259—does not pose a severe burden on the Committee's rights. However, the Court lacks sufficient record facts to further balance the state's justifications against the burdens experienced by the Committee. This is largely because the Committee's allegations regarding its burden "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Scoggins*, 718 F.3d at 470. Such a posture precludes this Court's adjudication.

We note that the Commonwealth has a duty to allow nomination methods that facilitate exclusive party affiliation and association, *see Miller v. Brown*, 503 F.3d 360 (4th Cir. 2007)

25

("*Miller II*"),[15] but the Committee also has a duty to first <u>attempt</u> compliance with state elections laws where those laws are reasonable and not discriminatory.

### 2. Hardship

As to hardship, the Committee argues that its case deserves expedient judicial resolution based on the timing constraints of the 2026 election cycle. It contends that, under Virginia law, it must call a meeting (and provide notice for that meeting) to vote on whether to hold a party-run process or submit to the state-run open primary. Dkt. 11 at 16. It contends that this decision "must be made within the **statutorily-mandated election calendar**," *id*, and under that calendar, none of these steps can occur until January 2026. *Id*. ("Thus, assuming January 1 as a holiday, no call can be issued until January 2, and no meeting held pursuant to that call until January 9."). However, the Committee's argument is unpersuasive for three reasons.

---

[15]    *Miller II* held that Virginia's open primary law was unconstitutional as applied to the 11th Senatorial District Republican Committee. The committee's incumbent candidate, Senator Stephen Martin, had opted for a primary contest in his upcoming reelection bid, and this choice bound the committee to a primary under the Incumbent Protection Act. Va. Code § 24.2–509(B). *Miller II*, 503 F.3d at 362. But because Virginia's open primary law required that primaries be open to all voters, the committee was effectively forced into a nomination contest in which it would be compelled to associate with non-party members. The Fourth Circuit struck down this application of the open primary law as unconstitutional. *Id*. at 370-71. The Court held that if a political party is compelled to select its candidates by a primary, the State cannot then force the party to include non-party members in the primary. *Id*.

The lesson from *Miller II* is that Virginia's open primary law, and indeed the state's entire election apparatus, is constitutional only insofar as it provides persons with alternative opportunities to associate by exclusion, *i.e.*, the opportunity to hold nomination contests that are exclusive to party affiliates. Where that option is foreclosed, even, for example, by the effect of an incumbent's lawful choice in *Miller II*, the State's election scheme becomes unconstitutional as applied.

For our purposes, this means that the Department of Elections has a constitutional duty to take seriously political parties' attempts to comply with the absentee provisions of Section 24.2-509(A). It cannot sit by, whether through malaise or intent, and merely await parties' collision with the law or their reluctant retreat. If the Department fails to provide guidance or clarity on the law, or fails to approve parties' bona fide and robust attempts at compliance, its inaction may constitute an unconstitutional obstacle to associational rights, no less than the combined effect of the Incumbent Protection Act and open primary law became an unconstitutional obstacle in *Miller II*.  *See* Va. Code § 24.2-103(A) ("The Department has the requisite authority to issue such guidance. See Va. Code § 24.2-103(A) ("The State Board, through the Department of Elections, . . . . shall make rules and regulations and issue instructions and provide information consistent with the election laws to the electoral boards and registrars to promote the proper administration of election laws.").

First, in a facial challenge to jurisdiction such as Commissioner Beals' Rule 12(b)(1) motion to dismiss, we must assume that the complaint's factual allegations are true. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). But the Committee's complaint is barren as to considerations of expediency or hardship. The Committee raises its arguments about constrained timelines only in its response to the motion to dismiss. *See* Dkt. 11 at 15–21. It does not allege facts regarding the "statutorily-mandated election calendar" in its complaint. This weighs against a finding of serious hardship on the Committee, but it is not dispositive.

Second, it is not clear to which "statutorily-mandated election calendar" the Committee refers. It states in its opposition that it "cannot file a notice for [its] 2026 nomination process in calendar year 2025." Dkt. 11 at 15. It cites Section 24.2-950, which provides that "[t]he political party committee's election cycle shall be deemed to begin on January 1 and continue through December 31 of each calendar year." However, this provision appears in Chapter 9.3 of the elections schema. Chapter 9.3 is titled "Campaign Finance Disclosure Act of 2006," and, unsurprisingly, its provisions govern the filing of campaign finance disclosure reports by various political entities. *See, e.g.*, Va. Code § 24.2-947.6(A) ("Any candidate for any office to be filled at a November general election shall file the [following] prescribed campaign finance reports."). Thus, while the Committee's cited provision from Chapter 9.3 does provide a "statutorily-mandated election calendar," it is not clear that this calendar applies to anything more than the Committee's financial disclosures.

Several other provisions come close to the Committee's argument but fail to mean what the Committee says they mean. For example, Section 24.2-510 dictates that a non-primary nomination can only occur "within the 47 days immediately preceding the primary date established for nominating candidates for the office in question." Va. Code § 24.2-510. Primaries

27

for November general elections in Virginia are held on the third Tuesday in June, which in 2026 will be June 16. *Id*. § 24.2-510(1). Thus, the actual nominating contest must occur no earlier than April 30, 2026. However, this does not facially prevent the Committee from developing and submitting a <u>plan</u> to Commissioner Beals before that time. Likewise, Section 24.2-516 states that "[e]ach chairman shall file timely written notice with the Board whether or not a primary has been adopted," and that this notice must occur "not more than 125 days and not less than 105 days" before the date set for the primary. But again, this does not expressly preclude a political party from developing and seeking approval of their non-primary method before that time. Finally, the Party Plan of the Republican Party of Virginia prohibits the Committee from calling a non-primary earlier than January 1 of the year in which the non-primary method would occur. *See* Dkt. 9-2 at 19 (Article VII(A)(2) of Party Plan) ("[N]o call shall be published earlier than January 1 of the year in which the Mass Meeting, Party Canvass or Convention will take place."). However, this is a self-imposed constraint, not a "statutorily-mandated" one. Accordingly, none of the foregoing provisions expressly preclude the Committee from developing an absentee voter plan and seeking pre-clearance for that plan before January 2026.

Commissioner Beals, moreover, has not taken any position to suggest that such pre-clearance efforts would be rejected.[16] No statutory or regulatory mechanisms have been

---

[16]    We take judicial notice that the Department of Elections' website contains a hyperlinked document called the "Political Party Bulletin" which provides deadlines for political parties for the upcoming 2025 election. *See* VIRGINIA DEPARTMENT OF ELECTIONS, Candidate Bulletins — "Political Parties" (last accessed July 23, 2025), https://www.elections.virginia.gov/candidatepac-info/candidate-bulletins/; Fed. R. Evid. 201(b)(2) (courts may take judicial notice of facts not subject to reasonable dispute because the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

The Bulletin, on page 3, provides that parties must provide "Notice of Nomination Method" through an online form by February 12, 2025, and it cites Va. Code § 24.2-516 as the corresponding statutory provision to support this deadline. Section 24.2-516 indeed states that "[e]ach chairman shall file timely written notice with the Board whether or not a primary has been adopted," and that this notice must occur "not more than 125 days and not less than 105 days" before the date set for the primary. Va. Code § 24.2-516. Thus, the Department of Elections has issued *some* guidance on deadlines via the Bulletin. But none of these deadlines facially preclude political parties from seeking some form of pre-clearance for their absentee compliance attempts in advance of this deadline.

presented which might formally structure a pre-clearance process, but several sources of law indicate that Beals has a legal duty to support parties' attempts at compliance in a way that safeguards their right to hold non-primary nominations. *See* Va. Code § 24.2-103(A) ("The State Board, through the Department of Elections, shall . . . . make rules and regulations and issue instructions and provide information consistent with the election laws to the electoral boards and registrars to promote the proper administration of election laws."). What's more, the Committee itself "may petition the board to consider a regulatory action." 1 Va. Admin. Code 20-10-50. This statutory and administrative schema suggests that Commissioner Beals, the Committee, and indeed all political parties are engaged in a working relationship to balance the interests of free association and absentee voting. Were the Commissioner to flout the obligations of this relationship, the Committee would have a different case. But otherwise, we must assume that Commissioner Beals and the relevant state agencies intend to operate in good faith. And in that light, the Committee's claim—that it is bound to some statutorily-mandated election calendar which pushes all its future attempts at compliance past a point of no return—is mere shadowboxing.

Finally, the Committee's theory of hardship is dissimilar from relevant caselaw on this question. The Fourth Circuit in *Miller* found that ripeness existed in part because "the plaintiffs would suffer undue hardship by waiting until the eve of the election to seek a decision in their case." *Miller*, 462 F.3d at 321. The Court observed that "[t]he open primary law causes immediate harm to their constitutionally protected rights because they know Democrats will be participating in their primary." *Id*. "By obtaining a final decision now, the plaintiffs will have adequate time to make effective campaign decisions." *Id*.

Here, the same considerations do not apply. Unlike *Miller*, Section 24.2-509(A) does not

cause "immediate harm to their constitutionally protected rights." It is not a foregone conclusion that the Committee will be unable to devise a non-primary contest that complies with Section 24.2-509(A). The Committee appears to have begun an attempt at compliance before being dissuaded by state party leaders—based on the leaders' estimation that the Attorney General's opinion is a death knell and that attempting compliance would be fool-hardy. But the opinions of the Attorney General and the state party leaders are not law, and otherwise there are no credible facts to support the inference that compliance is beyond reach.[17]

We acknowledge that "[b]ringing lawsuits on the eve of pending elections disrupts the electoral process." *Miller*, 462 F.3d at 320. Indeed, the Supreme Court in *Babbit* wrote extensively (albeit in a footnote) about the importance of ripeness challenges in the election context:

> Though waiting until appellees invoke unsuccessfully the statutory election procedures would remove any doubt about the existence of concrete injury resulting from application of the election provision, little could be done to remedy the injury incurred in the particular election. Challengers to election procedures often have been left without a remedy in regard to the most immediate election because the election is too far underway or actually consummated prior to judgment. Justiciability in such cases depends not so much on the fact of past injury but on the prospect of its occurrence in an impending or future election. There is value in adjudicating election challenges notwithstanding the lapse of a particular election because "[the] construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future

---

[17] While the Committee argues that absentee compliance will be unduly burdensome, the Court notes that the Party Plan of the state Republican Party, to which the Committee adheres, currently requires the provision of absentee participation in certain circumstances. (The Court can consider the Party Plan given the standard set forth in footnote 7 of this opinion. The Party Plan is integral to and explicitly relied on in the complaint. *See* Dkt. 1, ¶¶ 1, 19, 33; *see also* Dkt. 9-2 at 22.). Article VIII of the Plan governs "Mass Meetings, Party Canvasses, Conventions, and Primaries." Section H, Paragraph 7 states that "Military Members who are certified as delegates . . . that are unable to attend the convention in person . . . shall have their votes cast . . . according to candidate preference ballots. Candidate preference ballots shall list the Military Member's rank order preference among candidates (i.e., first choice, second choice, third choice, etc.)." Dkt. 9-2 at 2. Yet the Committee does not explain why a similar approach could not be adopted to comply with the absentee requirements of Va. Code § 24.2-509(A).

> challenges, thus increasing the likelihood that timely filed cases
> can be adjudicated before an election is held."

*Babbit*, 442 U.S. at 301 n.12 (quoting *Storer v. Brown*, 415 U.S. 724, 737 n. 8 (1974)) (other internal citations omitted).

But we have already explained why the statutory provisions that were ripe for adjudication in *Babbit* are meaningfully distinct from the capacious, unimplemented, and facially reasonable absentee voter provision in Section 24.2-509(A). Furthermore, while "[b]ringing lawsuits on the eve of pending elections disrupts the electoral process," *see Miller*, 462 F.3d at 320, entertaining as-applied challenges to statutes without any facts as to their application disrupts both the legislative and administrative process. Our respect for these processes must carry the day here. *See Abbott Labs*, 387 U.S. at 148–49 (stating that one purpose of the ripeness doctrine is to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties").

***

On balance, while the Committee may face some hardship by the Court withholding review, its alleged hardship is not a foregone conclusion. The Committee may yet seek <u>and receive approval</u> for holding a non-primary method in compliance with Section 24.2-509(A). Furthermore, any hardship the Committee faces is far outweighed by the lack of judicial fitness on the merits. The Committee brings an as-applied challenge to Section 24.2-509(A), but the resulting legal inquiry would turn on facts that are not yet in the record and, indeed, may never arise.

Accordingly, the Committee's as-applied challenge to the statute is not ripe and must be dismissed for lack of subject matter jurisdiction.

### B. The Facial Constitutionality of Section 24.2-509(A) is Not Ripe for Judicial Resolution

"[A] facial challenge is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the [challenged statute] would be valid." *United States v. Nutter*, 137 F.4th 224, 229 (4th Cir. 2025) (quoting *United States v. Rahimi*, 602 U.S. 680, 708 (2024)).[18] In other words, a plaintiff must show that *all* conceivable applications of the law are unconstitutional. The Supreme Court has lowered that "very high bar" in the First Amendment context, however. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (internal quotations omitted). First Amendment plaintiffs must show either that (i) no set of circumstances exist under which the law would be valid, or (ii) that the law lacks a "plainly legitimate sweep." *Id*. To show the law lacks a plainly legitimate sweep, the plaintiff must show that "a substantial number of the law's applications are unconstitutional," such that these applications "substantially outweigh its constitutional ones." *Id*. at 724.

Here, the Committee has not shown that Section 24.2-509(A) is unconstitutional as applied to its own circumstances, because, as noted, the Court concludes that such a claim is unripe and the Court lacks jurisdiction. If the Committee's as-applied challenge is unripe, it stands to reason that its larger facial challenge is unripe, too, because facial challenges depend on the plaintiff showing that no application of the statute could be constitutional, including application to its own circumstances.

Additionally, principles of judicial restraint which undergird ripeness doctrine likewise counsel restraint in evaluating facial challenges. "[F]acial challenges threaten to short circuit the

---

[18]     Facial challenges are difficult also due to principles of judicial restraint and constitutional avoidance. "Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement. And facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Moody v. NetChoice*, LLC, 603 U.S. 707, 723 (2024) (internal quotations omitted). Thus, the Supreme Court has "made facial challenges hard to win." *Id*.

democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Moody*, 603 U.S. at 723. In the same vein, one purpose of the ripeness doctrine is to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs*, 387 U.S. at 148–49. These principles counsel restraint in the case at bar. If this Court lacks an adjudicable controversy with respect to the Committee's as-applied claim, the Court should not venture even further afield to resolve the statute's application to others or to the abstract. Thus, the Committee's facial claim must likewise be dismissed for lack of ripeness and subject matter jurisdiction under Rule 12(b)(1).

## IV.    Conclusion

Commissioner Beals' motion to dismiss for lack of subject matter jurisdiction, Dkt. 8, will be **GRANTED** in an accompanying order.

The Clerk of Court shall send a copy of this Memorandum Opinion to all counsel of record.

Entered this 30th   day of July, 2025.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

33